AO 91 (Rev. 11/11) Criminal Complaint  AUSA Patrick M. Otlewski (312) 469-6045

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DAMARCUS BENNETT

CASE NUMBER:

UNDER SEAL

17 CR 296

MAGISTRATE JUDGE COX

**FILED** MAY - 4 2017 THOMAS G. BRUTON CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 15, 2014, at Chicago, in the Northern District of Illinois, Eastern Division, defendant DAMARCUS BENNETT violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | DAMARCUS BENNETT, having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly and intentionally possess in and affecting interstate commerce a firearm, namely, a 410 gauge Savage Arms, Stevens Model 940A shotgun and ammunition, which firearm had traveled in interstate commerce prior to BENNETT's possession of the firearm |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

_____
MARC RECCA
Special Agent, Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: May 4, 2017

_____
*Judge's signature*

City and state: Chicago, Illinois

SUSAN E. COX, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT    )
                                )  ss
NORTHERN DISTRICT OF ILLINOIS   )

I, Marc Recca, being duly sworn, state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed since March 6, 2016. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is an officer of the United States who is empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. Since becoming an FBI Special Agent, my duties have included the investigation of criminal violations of federal narcotics and firearms laws, including, but not limited to, 21 U.S.C. §§ 841(a), 843(b), and 846, along with violations of 18 U.S.C. § 922(g). In addition, I have been involved in various types of electronic surveillance (including the interception of wire and electronic communications) and the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of firearms and controlled substances. Through my training, education, and experience, I have become familiar with the manner in which firearms and illegal narcotics are transported, stored, and distributed, as well as the methods of payments for those firearms and narcotics.

3. Because this Affidavit is for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of an arrest warrant against the proposed defendant, it contains only a summary of relevant facts. I have not

included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

4. This Affidavit is made in support of a complaint that charges that, on or about July 15, 2014, at Chicago, in the Northern District of Illinois, defendant DAMARCUS BENNETT, previously having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly and intentionally possess in and affecting interstate commerce a firearm, namely, a 410 gauge Savage Arms, Stevens Model 940A shotgun and ammunition, which firearm had traveled in interstate commerce prior to BENNETT's possession of the firearm, in violation of 18 U.S.C. § 922(g)(1).

5. The statements contained in this Affidavit are based on (a) information provided by other federal and local law enforcement officers ("LEOs"); (b) my review of in-person and telephonic consensually-recorded conversations; (c) surveillance and debriefing reports; (d) criminal history records and court records; (d) information from cooperating sources; (e) telephone toll records; and (f) my training and experience and the training and experience of other LEOs involved in this investigation.

## II. ON OR ABOUT JULY 15, 2014, BENNETT KNOWINGLY AND INTENTIONALLY POSSESSED A FIREARM, IN VIOLATION OF 18 U.S.C. § 922(G)

### A. Background

1. A confidential source ("CS")[1] reported to LEOs that, on or about July 11, 2014, the CS was in the area of 76th Street and Bishop on the south side of Chicago when the CS saw Individual A and Individual B. The CS asked them about "bangers," which the CS has explained to be a street term for firearms.[2] Individual B stated that s/he would be back, left the area, then returned in a gray four-door vehicle driven by DAMARCUS BENNETT. According to the CS, BENNETT showed the CS a shotgun and two handguns that were in the back seat area of BENNETT's vehicle. The CS described the handguns as a nine-millimeter semi-automatic pistol and .380 semi-automatic handgun. According to the CS, the CS offered BENNETT $1,500 for the three firearms. BENNETT agreed to sell the firearms for $1,500 to the CS. The CS advised that s/he would get back with BENNETT about completing the firearms

---

[1] CS is a convicted felon with three known prior felony convictions and multiple arrests, including separate convictions for armed robbery, theft, and aggravated battery. CS cooperated in this investigation with the expectation of monetary compensation by law enforcement and was paid approximately $7,896.75 by LEOs for cooperation services. The information provided by CS has been corroborated and found reliable by LEOs, both in this investigation and in other investigations where CS provided cooperation.

[2] The conversations summarized in this Affidavit do not include references to all topics covered during the course of the conversation. The summaries also do not include references to all statements made by the speakers on topics described. All quotations from recorded conversations are based on draft, not final, transcriptions of those conversations and/or from your Affiant having personally listened to the recordings. The times listed for the recorded conversations are approximate. At various points in the Affidavit, I include in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on the contents and context of the recorded conversation, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other LEOs in this investigation.

transaction.

2. On or about July 11, 2014, at approximately 2:59 p.m., the CS had a consensually-recorded telephone conversation with BENNETT, who was using telephone number (224) 725-8150.[3] The CS asked, "What was that [a reference to the firearms BENNETT showed the CS earlier that day]?" BENNETT stated, "That's a ten gauge [a ten-gauge shotgun]." The CS asked, "Yeah? How many shells it take?" BENNETT answered, "One. A single shot." The CS asked, "And how much you asking me for it?" BENNETT answered, "A hundred [$100]." BENNETT then asked, "Look, you got fifteen for three of them [$1,500 for three firearms]?" The CS answered, "Yeah." BENNETT stated, "I got a three eighty [.380 caliber handgun], I got a chrome deuce five with a white handle [.25 caliber handgun], and I got that rifle [the single-shot 10-gauge shotgun]." BENNETT asked, "When you want to do it?" BENNETT stated, "If it happen tonight, then I make my moves to the crib to get the rest of my shit out." The CS responded, "I don't need no shells." BENNETT replied, "I'm not talking about shells, I'm talking about the rest of my shit [firearms]. I only got the rifle with me right now." The CS responded, "Alright, you know what I'm saying, give me a little time, you know what I'm saying, cause I got my own little, little, little spot, you know what I'm saying. So I'm a get back with you in a minute you know what I'm

---

[3] The identification of BENNETT and BENNETT as the user of this telephone number is based on the following: (a) the CS identified this telephone number as belonging to BENNETT and identified BENNETT as the user; (b) LEOs compared the voice on this recorded call to the audio-video recording from June 15, 2014, and determined that the voice in the call belonged to the person identified as BENNETT in the audio-video recording; and (c) the user of this phone number arranged a meeting with CS, where BENNETT subsequently met with CS at the arranged-upon date and location and where LEOs physically observed BENNETT.

4

saying, alright."

3. Continuing on July 11, 2014, at approximately 4:29 p.m., the CS had a consensually-recorded telephone conversation with BENNETT, who was using telephone number (224) 725-8150. The CS asked, "How much you want for everything all together? I'm getting my paper [money] together." BENNETT stated, "Fifteen hundred [$1,500], like you said. You came to me with that price." BENNETT stated, "I got a ten-gauge shotgun. I got a, a three eighty [.380 caliber handgun], and I got a um, goddamn it, um, a deuce five, chrome deuce five [.25 caliber handgun]. It's a Raven [Raven Arms MP-25 .25 caliber pistol]." BENNETT then stated, "I got the shit, so shit." When the CS stated that if s/he may have to do deal the next morning, BENNETT responded, "That's what's up, shit. I'm a, I'm a, have it, I got it." The CS responded, "Man, don't get rid of that shit. I need it, man." BENNETT responded, "I got you, shit. First, a matter of fact I think that's the way we should do it anyway. Just come holler at me in the morning. You come holler at me in. You come get them, you know what I'm saying, I'll have you just come over here, on my block. The CS asked, "Where you at?" BENNETT responded, "I'm on Laflin." The CS asked, "On what and Laflin?" BENNETT answered, "79th [79th and Laflin on the south side of Chicago]." The CS asked, "79th and Laflin?" BENNETT answered, "Mm, hm."

4. Continuing on or about July 11, 2014, at approximately 5:24 p.m., the CS had a consensually-recorded telephone conversation with BENNETT, who was using telephone number (224) 725-8150. The CS asked, "You gonna hold them [the firearms] for me?" BENNETT responded, "I got you." The CS stated, "I need a 6-3.

5

You know somebody who got that?" BENNETT responded, "I can try and see." When the CS stated that s/he would call BENNETT around 12:00 p.m., BENNETT responded, "That cool."

**B.  BENNETT Possessed a Shotgun on or about July 15, 2014, which BENNETT Sold to the CS for $200.**

5.  On or about July 15, 2014, LEOs met the CS at a predetermined location where LEOs searched the CS and the CS's vehicle for contraband, money, firearms, and narcotics with negative results. LEOs gave the CS $1,000 in U.S. currency with the instruction to use the money to purchase firearms from BENNETT. LEOs also equipped the CS with an audio-video recording device and activated the device. LEOs initiated surveillance of the CS and maintained surveillance of the CS for the duration of the operation.

6.  Continuing on or about July 15, 2014, at approximately 12:32 p.m., LEOs observed the CS speak to Individual A in the area of 76th Street and Bishop Street, on the south side of Chicago. The CS and Individual A then walked together in the direction of a residence on the 7600 block of South Bishop Street.

7.  At approximately 12:33 p.m., LEOs observed the CS and Individual A enter the CS's vehicle and the CS drove Individual A to the area of 80th and Laflin, on the south side of Chicago. According to the audio-video recording device, during the drive, the CS asked Individual A, "You sure I can fuck with this nigga [BENNETT], man?" Individual A answered, "Yeah, he's good. That's one of the guys. He's straight." The CS asked, "Do we gotta go to him?" Individual A responded, "Yeah." The CS asked, "Where he [BENNETT] at?" Individual A answered, "Laflin.

6

80th and Laflin."

8. At approximately 12:37 p.m., according to the audio-video recording device, Individual A directed the CS to pull over, and Individual A exited the CS's vehicle. LEOs observed Individual A exit the vehicle. According to the CS, BENNETT was working on a nearby van parked in the area with an unidentified male.

9. At approximately 12:38 p.m., according to the audio-video recording, BENNETT walked up to the CS while the CS was standing outside CS's vehicle. The CS asked, "You got me?" BENNETT responded, "Yes, sir." BENNETT stated, "I gotta call my OG because I only got two of them today [BENNETT only had two firearms ready to sell]." The CS responded, "Alright, uh, give me them two." BENNETT asked, "What you got for them?" The CS answered, "Five [$500]." BENNETT stated, "Five, [whistling] right." The CS stated, "I ain't got no time to be wasting, man. It's too hot over here." BENNETT asked, "And you said eight for them other two, right?" The CS answered, "I want all three of them, if you got them." BENNETT responded, "Right, right, but I only got two right now. The other one's in the 100s [BENNETT had two firearms ready to sell, the other one was located elsewhere]." The CS asked, "What you got?" BENNETT said to Individual A, "Step in front over here [in order to block their activity from view by outsiders]." Individual A then moved closer. BENNETT stated, "I got this right here, but I ain't got no shells for it, and then uh." According to the CS, BENNETT displayed a black .38 caliber handgun that was tucked into BENNETT's waistband. The CS stated, "OK. OK." BENNETT said, "And I got that little, uh." The CS interjected, "Gauge [shotgun]?" BENNETT stated, "What I showed

7

you." The CS responded, "Alright, bring them and put them, put them in the car." BENNETT stated, "Look, look, look, I don't know this work, right though. What I'm saying about my homie, he got a shell, we finna go bust it real quick [BENNETT wanted to test fire the shotgun]." The CS responded, "You ain't even gotta worry about it. I'll take care of it myself." According to the audio-video recording, BENNETT then walked towards a house.

10. According to the audio-video recording, at approximately 12:44 p.m., BENNETT walked back from the house to the CS.[4] BENNETT was smiling. BENNETT then walked away. The CS and Individual A reentered the CS's vehicle and the CS drove down the street. LEOs observed the CS's vehicle drive east on 80th Street, then southbound on Bishop into the alley behind Laflin.

11. At approximately 12:47 p.m., according to the audio-video recording, BENNETT walked up to the driver's side of the CS's vehicle where the CS was sitting, while parked in the alley. The CS asked, "What up, big homie?" BENNETT responded, "You give me 150 [$150], and I'll give all the shells with it. I got like 30 some shells." The CS replied, "Go get 'em, man." BENNETT asked, "A buck fifty for all that [$150 for the shotgun and the shells]?" The CS answered, "Yeah." BENNETT

---

[4] The residence from where BENNETT came to meet the CS in the street, and where the firearm is believed to have come from was 8018 S. Laflin Street, Chicago, Illinois, and the alley where the firearm purchase occurred was the alley behind 8018 S. Laflin Street, based on my investigation and review of the audio-video recording as well as my personal knowledge of the neighborhood based on surveillance on April 27, 2017. According to public records databases and law enforcement databases, this residence was occupied in the past by a person believed to be BENNETT's father, and at or around the time of the firearms purchase, is believed to have been occupied by BENNETT's maternal grandmother. The databases also reflect that additional relatives and associates of BENNETT lived at residences on South Laflin Street in Chicago, Illinois.

said, "Alright." Individual A then said, "You got a fifty?" The CS responded that s/he didn't. The CS stated that the extra $50 was a "courtesy." The sound of paper rustling, consistent with the sound of money being counted, could be heard on the recording device at this time.

12. At approximately 12:48 p.m., according to the audio-video recording, the CS exited the CS's vehicle and stood outside it while it was parked in the alley. At approximately 12:49 p.m., BENNETT and Individual A walked together to the trunk of the CS's vehicle. Individual A then placed an item inside the trunk. When Individual A walked away, BENNETT said, "Hey look, I'm going to get my OG and I'll bring the other one over here [BENNETT was offering to have an associate bring the other firearm over to sell to the CS]." The CS said, "Alright." When the CS mentioned doing the deal the next day, BENNETT said, "We gonna do business."

13. According to the audio-video recording device, the CS and Individual A then entered the CS's vehicle and drove away. While in the CS's vehicle, CS stated to Individual A that s/he dropped a $100 bill. The CS asked Individual A to let the CS know if Individual A found the money.[5] Individual A then exited the CS's vehicle in a neighborhood nearby.

14. At approximately 1:00 p.m., according to the CS, Individual A called the CS on the CS's cellphone and asked when Individual A was going to get paid. The CS

---

[5] LEOs reviewed the audio-video recording and observed that, when the CS removed a cellphone from a pocket, the CS dropped a $100 bill on the ground. The bill landed in the area of 76th Street and is visible on the audio-video recording.

responded that Individual A would be taken care of in the next deal.[6]

15. The CS then drove to a predetermined meet location and met LEOs. LEOs deactivated and removed the audio-video recording device. LEOs then recovered $700 from the CS. LEOs then retrieved a 410 gauge Savage Arms, Stevens Model 940A shotgun, 36 Winchester AA 410 gauge shotgun shells, and one Winchester AA 410 gauge shotgun shell casing from the trunk of the CS's vehicle. LEOs then searched the CS and the CS's vehicle for contraband, excess cash, and other weapons with negative results.

### C. BENNETT Is a Convicted Felon.

16. According to a law enforcement database, on or about November 6, 2009, BENNETT was convicted in the Circuit Court of Cook County, Illinois (08-CR-1337), of aggravated discharge of a firearm at an occupied vehicle, in violation of 720 ILCS § 5/24-1.2(a)(2), and was sentenced to the Cook County Department of Corrections Boot Camp. According to 720 ILCS § 5/24-1.2(b), a violation of § 5/24-1.2(a)(2) is a Class 1 felony. According to 730 ILCS § 5/5-4.5-30(a), a Class 1 felony is punishable by a term of imprisonment of not less than 4 years and not more than 15 years.

### D. The Shotgun Traveled in Interstate Commerce Prior to BENNETT's Possession of It.

17. According to law enforcement and public databases, the 410 gauge Savage Arms, Stevens Model 940A shotgun is manufactured in the Commonwealth of Massachusetts. Thus, based on my training and experience, the firearm BENNETT

---

[6] The CS's side of the conversation with Individual A is audible on the audio-video recording. This telephone contact is corroborated by telephone company toll records.

possessed on or about July 15, 2014, in Chicago, Illinois, traveled in interstate commerce prior to BENNETT's possession of that firearm.

### III. CONCLUSION

18. Based on the foregoing, Your Affiant respectfully submits that there is probable cause to believe that, on or about July 15, 2014, at Chicago, in the Northern District of Illinois, defendant DAMARCUS BENNETT, previously having been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly and intentionally possess in and affecting interstate commerce a firearm, namely, a 410 gauge Savage Arms, Stevens Model 940A shotgun and ammunition, which firearm had traveled in interstate commerce prior to BENNETT's possession of the firearm, in violation of 18 U.S.C. § 922(g)(1).

FURTHER AFFIANT SAYETH NOT.

MARC RECCA
FBI Special Agent

SUBSCRIBED AND SWORN to
before me on May 4, 2017.

SUSAN E. COX
United States Magistrate Judge
Northern District of Illinois