IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. 17 – CR – 296 (1) |
| | ) | |
| vs. | ) | |
| | ) | Hon. Judge Ronald A. Guzman |
| DAMARCUS BENNETT, | ) | |
| Defendant. | ) | |

### Defendant's Sentencing Memorandum

NOW COMES DAMARCUS BENNETT, by and through his attorneys, BRENDAN SHILLER, pursuant to Local Criminal Rule 32.1(g), presents Objections to the PSR and Sentencing Memorandum, stating as follows:

### I.      Introduction

Sometimes what appears to be a routine matter with a familiar narrative actually involves a unique character with some remarkable traits. In this case, what is remarkable about Damarcus Bennett is the under mundaneness with which he has worked and supported his family for the last several years. Juxtaposed against his criminal history, such mundane and consistent work-ethic and domestic responsibility is notable and remarkable and deserves attention by this court. Further, it sheds light on what is an overstated criminal history category.

### II.      Factual and Procedural Background

a. *Bennett's Background*

Damarcus Bennett was born in 1989 to Bruce Bennett and Jacqueline Mckinnie who were not married to one another. PSR, ¶49. Bennett's father is employed as a machinery mechanic / engineer at M&M Mars Co. and the two have a good relationship and are similar in personality. Id. Bennett has a "really close" relationship with his mother. Id. His mother is currently unemployed

1

due to her illness—she is currently in remission for breast cancer. Id. Bennett has one older, full biological brother, Michael, who suffers from sickle cell disease, paranoid schizophrenia including hallucinations, and bipolar disorder. PSR, ¶50. Bennett has a close relationship with Michael who relies on Bennett as a constant source of comfort. Id. Before Bennet's birth, his father fathered a Keisha Norman, Bennett's half-sister, and his mother gave birth to his half-bother, Ahmad Coleman. Bennett has a closer relationship with Keisha than with Ahmad, but all of his family members have been very supportive throughout these criminal proceedings. PSR, ¶51.

Bennett was primarily raised in a single parent household with his mother as his primary caregiver. PSR, ¶52. Despite his father's involvement in Bennett's upbringing, Bennett failed to have a steady positive male role model in his life and there were a stream of males in and out his childhood home and his and his mother's life. Id. Even though Bennett himself never personally saw his mother suffer domestic abuse, he had suspicious of her many boyfriends and of his father. Id. (Bennett's mother reports that Bennett was too young to remember or not present at all to witness her abuse.) Id. The neighborhood in which Bennett lived wasn't safe from violence either; as a child, Bennett witnessed violence, drug use, and gang activity that took place just feet from his front door in the Auburn Gresham community where he grew up. Id.

Bennett is not married but is in a long-term monogamous relationship with his girlfriend and the mother of his two children, Taesha Livingston. PSR, ¶53. Ms. Livingston resides in Elgin, Illinois with their two children, Damarcus Llewellyn Bennett and Londyn Bennett; Livingston's child, Mikayla Livingston resides there as well. Id. The children are ages 2, 1, and 7 respectively. Id. Bennett not only has a good relationship with his two own children but also has a very close relationship with his step daughter, Mikayla. Id. He has been a steady father figure in Mikayla's life since 2015 when Bennett and Ms. Livingston first started dating. Id.

Bennett currently resides with his father, Bruce Bennett and older brother, Michael Bennett, in Glendale Heights, Illinois. PSR, ¶54. As stated earlier, Bennett provides support and comfort for his brother, Michael, and is usually the one to calm Michael down when an aspect of his illnesses flairs up. PSR, ¶50. Bennett has resided at his current address for approximately 8 years, since 2010 and has been a lifelong resident of the Northern District of Illinois. PSR, ¶54.

Bennett suffers from diabetes, hypercholesterolemia and hypertension; he is also unsurprisingly (based on his brother's condition) a heterozygous carrier of the sickle cell trait. PSR, ¶57. To treat these conditions, he has been prescribed various prescription medications including a statin, a diuretic and an antihyperglycemic. Id. Bennett endured unremarkable surgeries and hospital stays in 2009, 2007 and at the age of 14 and has a drug allergy to a topical agent. PSR, ¶58-60. The defendant's experience with controlled substances (other than medication) appears to be limited to marijuana of which he wisely did not partake while under this Court's pre-trial supervision. PSR, ¶62-66.

Despite his recent health issues, Bennett has achieved steady gainful employment over recent consecutive year using his skills in auto mechanics and crane and forklift operation. PSR, ¶69-76. Bennett moved up through various hourly jobs constantly seeking better opportunities. Id. His employment history is nothing short of remarkable given the barriers to entry that convicted felons like Bennett face in the employment marketplace[1]. Despite his employment, Bennett is of meager financial resources and pays child support to the mother of his children. PSR, ¶78.

b. *Nature of Offense*

On July 11, 2014, Defendant met with an associate and arranged for the sale of a shotgun and 36 shotgun shells to another individual who, unbeknownst to defendant, was a confidential

---

[1] *65 Million "Need Not Apply"*, The National Employment Law Project, March 2011, http://www.nelp.org/content/uploads/2015/03/65_Million_Need_Not_Apply.pdf?nocdn=1 (last accessed May 31, 2018).

informant (CI) working with the government. R. 49 at 2. The defendant brought the shotgun and shells to the CI's vehicle and the CI paid the Defendant $200. Id. The Defendant acknowledged that prior to July 15, 2014, or about November 6, 2009, in the Circuit Court of Cook County, Illinois, defendant had been convicted of aggravated discharge of a firearm at an occupied vehicle in violation of 750 ILCS 5/24-1.2(a)(2), which is a felony punishable by a term of imprisonment exceeding one year. Id. Defendant further acknowledged that, prior to his possession of the shotgun, it traveled in interstate commerce as it was manufactured in Massachusetts. Id. The Defendant pled guilty to one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). See generally R. 49.

### III.    PSR Objections

The Defendant makes the following objection to the PSR:

1. The Defendant objects to ¶34 of the PSR in that it assigns two (2) criminal history points for a conviction in which the defendant was sentenced directly to boot camp by a Cook County Circuit Court Judge. The United States Probation Office "submits that the Cook County Sheriff's Office boot camp program was a 180-day strict detention program based on basic discipline, educational skills, counseling and alcohol/substance abuse treatment, which also featured a 240-day long post-release supervision program" and "[d]ue to the fact that the boot camp program included 180 days of detention, two criminal history points are assigned to the above conviction". However the Probation Office submits no evidence that any Court or Judge actually sentenced Bennet to a "sentence of imprisonment of at least sixty days." USSG §4A1.1(b). "The term 'sentence of imprisonment' means a sentence of incarceration and refers to the maximum sentence imposed." USSG §4A1.2(b)(1). The probation office appears to inadvertently conflate the length of confinement one actually experiences in boot camp (determined by the Cook County Department of Corrections)

4

with a sentence of imprisonment imposed by a Judge or Court. The Seventh Circuit has even opined that "the legal effect on a sentence of successfully completing the Illinois boot-camp program more closely resembles a commutation or pardon by the executive." *United States v. Gajdik*, 292 F.3d 555, 560 (7th Cir. 2002)[2]. "[C]riminal history points are based on the sentence pronounced, not the length of time actually served. See §4A1.2(b)(1) and (2)." USSC §4A1.2, comment. (n.2). Because no term of imprisonment was imposed by the Cook County Circuit Court, one (1) criminal history point should be assigned for this conviction under USSG §4A1.1(c).

## IV. Downward Departure Motion Pursuant to §4A1.3(b)(1)

The Defendant's criminal history score is over-representative of his criminal history and, thus, a downward departure in criminal history score is warranted pursuant to §4A1.3(b)(1). Specifically, the following of defendant's publishable convictions warrant consideration:

1. Defendant restates and incorporates his argument regarding the Boot Camp sentence made in Section III(1) *supra*. Should the court not find said argument persuasive as a direct objection to the PSR, Defendant asks that the Court consider the Boot Camp argument in the alternative as part of a downward departure motion pursuant to §4A1.3(b)(1).

2. Bennett receives one (1) criminal history point for violation of a municipal ordinance; he was apprehended in possession of a personal amount of cannabis in 2012 in DuPage County, Illinois. PSR, ¶35. Currently pending in Springfield Illinois is SB 316, which, amongst other things, would eventually result in the expungement of cannabis possession convictions in Illinois. Although it is not expected that the Steans/Cassidy bill will pass this

---

[2] The defendant in *Gajdik* was sentenced by the Cook County Circuit Court to a suspended sentence of five years' incarceration *and* to CCDOC Boot Camp. Accordingly, the Judge actually did impose upon Gajdik a "sentence of imprisonment" under §4A1.2(b)(1); it was just suspended and the Seventh Circuit found as much. Contrastingly, in the case at bar, Bennett was sentenced directly and only to CCDOC Boot Camp by the Cook County Circuit Court; no term of imprisonment, suspended or otherwise, was imposed. Exhibit 1 at 5.

year, it is generally anticipated that following the November general election it will pass next year. Furthermore, a defendant with different personal characteristics might not have been sanctioned at all for such an offense: Although white individuals use marijuana at approximately the same rate as black individuals—in the year 2010, 12% of white US individuals reported use within the past year compared with 14% of black US individuals[3]— DuPage County has a penchant for arresting and/or charging mostly the latter. Specifically, according to 2010 FBI Uniform Crime Report data, black persons were 5.3 times more likely to be arrested for marijuana possession in DuPage County than were white persons[4].

3. Defendant notes that his conviction for DUI (also in DuPage County) was for driving under the influence of drugs. Specifically, a urine test taken incident to the arrest revealed the presence tetrahydrocannabinol metabolite and Defendant received a DUI conviction based on that positive drug test. PSR, ¶36. However, under current Illinois law, the mere presence of tetrahydrocannabinol metabolite no longer suffices to meet the elements of a DUI. Rather, a quantitative threshold of 10 nanograms of Δ-9-tetrahydrocannabinol per milliliter of urine would need to be exceeded in order to support a DUI conviction. 625 ILCS 5/11-501.2(a)(6). Therefore, under current Illinois law, Bennett's conduct would not be criminal. In aggregate, Bennett received three (3) criminal history points for this charge[5].

Accordingly, the Court should depart downward from a criminal history category of III to a criminal history category of II.

---

[3] *The War on Marijuana in Black and White* at 21, ACLU, June 2013, https://www.aclu.org/files/assets/aclu-thewaronmarijuana-rel2.pdf (last accessed May 30, 2018).
[4] Id at 148. (Illinois statistics page of ACLU report appended as Exhibit 2 for convenience of the court).
[5] The defendant was not charged with the generic Illinois DUI drug offense: "A person shall not drive or be in actual physical control of any vehicle within this State while under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving." 625 ILCS 5/11-501(a)(4). The defendant was, in fact, not charged with DUI at all until the results of the urine test screen came back implying that he was not visibly impaired. PSR, ¶36. The defendant was charged with DUI for having "any amount" of a drug (or metabolite) in his urine. 625 ILCS 5/11-501(a)(6).

## V. §3553 Factors

### i. Standard of Review

The mandate of 18 U.S.C. §3553(a) is for this Court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of that same statute. 18 U.S.C. §3553(a). Under 18 U.S.C. §3553(a), this court is to consider seven general factors: 1. the nature of the offense and the history of the defendant; 2. the need for the sentence to punish, deter, and rehabilitate; 3. the kinds of sentences available; 4. the advisory guideline range; 5. pertinent policy statements under Section 994; 6. avoidance of sentencing disparities; and 7. providing of restitution to the victims.

It is clear that there is no presumption favoring the guidelines in the district court. "[T]he sentencing court does not enjoy the benefit of a legal presumption that the guideline sentence should apply." *United States v. Rita*, 551 U.S. 338, 351 (2007). Thus, there is "no thumb on the scale in favor of a guideline sentence." *United States v. Wachowiak*, 496 F.3d 744, 749 (7th Cir. 2007). In fact, the guidelines can be given little or no weight, as can any or all of the Section 3553(a) factors. This is up to the Court as it reaches the goal of finding a sufficient sentence that is not greater than necessary. *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006).

### ii. Application of §3553 Factors

#### a. *The Nature of the Offense and History of the Defendant*

Other than his Illinois conviction for aggravated discharge of a firearm at an occupied vehicle in 2008 for which the Defendant was sentenced to boot camp at the age of 19, the Defendant's criminal history can be summed up as arrests stemming from the use of (or in one case minor distribution of) marijuana. And although the Defendant certainly has used marijuana in the past, he has not used marijuana while under this Court's pre-trial supervision. The instant

7

offense to which the defendant pled guilty—possession of a firearm by a convicted felon—is no doubt a serious matter requiring the United States' attention; however, it was an anomaly in the Defendant's otherwise violence-free recent past. Most significant, however, is the Defendant's recent honest work history: Despite two years of incarceration, the Defendant was able to achieve steady honest employment at a variety of jobs earning $12 to $16 per hour. Given the Defendant's recent work history, a shorter custodial sentence would be appropriate to allow the Defendant to return to free society as a productive member sooner rather than later.

### b. *The Need to Deter, Punish, and Rehabilitate*

General and specific deterrence as well as punishment in this case are sufficiently addressed by the guidelines. The Defendant in this case is not alleged to have substance abuse issues in need of serious attention and he has his high school diploma negating the need for extensive rehabilitation. Accordingly, 18 U.S.C. §3553(a)(2) weighs in favor of a lower sentence.

### c. *The Kinds of Sentences Available*

18 U.S.C. § 924 provides for a term of imprisonment of 0 to 10 years and a fine of up to $250,000. Under §5F of the US Sentencing Guideline Manual this Court has at its discretion a number of options in ordering a sentence including probation, community service, home detention, intermittent confinement and a fine.

### d. *The Guidelines Range*

So far, all parties agree that the base offense level is 20 pursuant to USSG §2K2.1(a)(4) and that the Defendant earns a 3-level reduction for acceptance of responsibility resulting in an offense level of 17. The government's version of the offense and Probation do not concur with respect to criminal history category and therefore differ with respect to guidelines range: Whereas the government's version of the offense assigns one (1) criminal history point for the Boot Camp

8

sentence—Gov. Ver. Off. at 4—the Probation Office assigns two (2) points. PSR, ¶34. Similarly, whereas the government's version omits Defendant's 2012 municipal-ordinance marijuana possession violation, the Probation Office assigns one (1) point for this violation. PSR, ¶35. Accordingly, the government's version places Bennett in criminal history III with a guidelines range of 30 to 37 months whereas the Probation Office places him in criminal history category IV with a guidelines range of 37 to 46 months. Defendant, based on his arguments with respect to criminal history made *supra* in Sections III and IV of this Motion takes the position he falls into criminal history category II, and therefore, his guidelines range is 27 to 33 months[6].

### e. Pertinent Policy Statements

There are no pertinent policy statements unique to the facts of this case.

### f. Avoidance of Sentencing Disparities

Sentencing disparities are not an issue in this case.

### g. Providing Restitution to Victims

Restitution is not an issue in the case at bar.

## VI. Conclusion

For the foregoing reasons, Defendant requests a sentence below the applicable guideline range.

Respectfully submitted,

/s/ Brendan Shiller
Attorney for Defendant
Shiller*Preyar Law Offices
601 S. California Ave
Chicago IL 60612
312-226-4590
Attorney No. 6279789

---

[6] The government's version does not specify a fine guidelines range however the Probation Office Sentencing Recommendation specifies $5,000 to $50,000 as the fine guideline but in any event does not recommend that a fine be imposed. The guideline for supervised release is 1 to 3 years per the Probation Office Sentencing Recommendation. The defendant does not wish to quarrel with any of these calculations.

9